UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA ANN LIVINGSTON, individually and as personal representative of the estate of Gerald Livingston, DEBORAH SELBY, DOUGLAS LIVINGSTON, and DAVID LIVINGSTON,<br><br>        Plaintiffs,<br><br>   v.<br><br>ABB, INC., individually and as successor-in-interest to ITE IMPERIAL CO. f/k/a ITE CIRCUIT BREAKER COMPANY, et al.,<br><br>        Defendants. | Case No. 2:12-cv-01220-WGY<br><br>MEMORANDUM AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT [ECF NOS. 330, 333, 336, and 341] |

YOUNG, D.J.[1]                                              April 2, 2015

## I.    INTRODUCTION

Patricia Ann Livingston, Deborah Selby, Douglas Livingston, and David Livingston (the "Plaintiffs") bring this action for the wrongful death of Gerald Livingston ("Livingston"), allegedly caused by exposure to asbestos and asbestos-containing products.  See Second Am. Compl. Wrongful Death ("Am. Compl."), ECF No. 187.  Motions for summary judgment were filed by four

---

[1] Of the District of Massachusetts, sitting by designation. See Order Chief Judge 14-012, ECF No. 403.

1

defendants: United Technologies Corporation ("UTC"), Schneider Electric USA, Inc. ("Schneider"), Curtiss-Wright Corporation ("Curtiss-Wright"), and Eaton Corporation ("Eaton") (collectively, the "Defendants"). On September 10, 2014, the Court issued an order setting out some of its rulings and inviting further briefing. Here, the Court sets out its remaining rulings and explains its reasoning as to all four motions.

### A.   Procedural Posture

This action was initiated on February 10, 2012, when Livingston and his wife Patricia Ann filed a personal injury complaint in the Central District of California against more than two dozen defendants for exposing Livingston to asbestos. See Compl., ECF No. 1. On September 3, 2012, Livingston passed away, and his heirs were granted leave to file an amended complaint for wrongful death. See Pls.' Case Status Report 1:20, 2:1-9, ECF No. 184; Minutes Status Conf., Oct. 1, 2012, ECF No. 186. A second amended complaint was filed on October 15, 2012, by Patricia Ann Livingston (acting both individually and as personal representative of Gerald Livingston's estate) Deborah Selby, Douglas Livingston, and David Livingston. See Am. Compl.

Four motions for summary judgment, all specifically addressed to the issue of asbestos exposure, are before the

Court. First, on September 19, 2013, UTC filed a motion for summary judgment as to all claims against it. Def. United Techs. Corp.'s Notice Mot. Summ. J. ("UTC SJ Mot."), ECF No. 330; see id., Ex. 1, Def. United Techs. Corp.'s Mot. Summ. J.; Mem. Points & Auths. ("UTC's Mem."), ECF No. 330-1. The Plaintiffs filed a memorandum in opposition to UTC's motion on October 4, 2013. Pls.' Mem. Points & Auths. Opp'n Def United Techs. Corp.'s Mot. Summ. J. ("Pls.' UTC Opp'n"), ECF No. 347. UTC filed a reply on October 18, 2013. Def. United Techs. Corp.'s Reply Supp. Mot. Summ. J. ("UTC's Reply"), ECF No. 365. Almost a year later, on August 27, 2014, the Plaintiffs filed a supplemental opposition brief containing deposition testimony taken after their original opposition brief was filed. See Supp. Opp'n & Pls.' Mem. Points & Auths. Opp'n Def. United Techs. Corp.'s Mot. Summ. J. ("Pls.' Supp. UTC Opp'n"), ECF No. 421. UTC responded on September 2, 2014, pointing out that the Plaintiffs did not seek leave to file further briefs with the Court and substantively responding to the Plaintiffs' supplemental arguments. See Def. United Techs. Corp.'s Resp. Pls.' Supp. Opp'n Mot. Summ. J.; Decl. John K. Son ("UTC's Supp. Reply"), ECF No. 424.

Second, on September 20, 2013, Schneider filed a motion for summary judgment on all claims as to it. Notice Def. Schneider Elec. USA, Inc.'s Mot. Summ. J. ("Schneider SJ Mot."), ECF No.

3

333; see id., Ex. 1, Mem. Points & Auths. Supp. Def. Schneider
Elec. USA, Inc.'s Mot. Summ. J. ("Schneider's Mem."), ECF No.
333-1.  The Plaintiffs filed their opposition on October 4,
2013.  Pls.' Mem. Points & Auths. Opp'n Def. Schneider Elec.
USA, Inc.'s Mot. Summ. J. ("Pls.' Schneider Opp'n"), ECF No.
350.  Schneider replied on October 18, 2013.  Def. Schneider
Elec. USA, Inc.'s Reply Br. Supp. Mot. Summ. J. ("Schneider's
Reply"), ECF No. 363.

Third, on September 20, 2013, Curtiss-Wright moved for
summary judgment on all claims against it.  Def. Curtiss-Wright
Corp.'s Notice Mot. & Mot. Summ. J. Causation ("Curtiss-Wright
SJ Mot."), ECF No. 336; see id., Ex. 1, Def. Curtiss-Wright
Corp.'s Mem. Points & Auths. Supp. Mot. Summ. J. Causation
("Curtiss-Wright's Mem."), ECF No. 336-1.  The Plaintiffs filed
their opposition on October 4, 2013.  Pls.' Mem. Points & Auths.
Opp'n Def. Curtiss-Wright Corp.'s Mot. Summ. J. ("Pls.' Curtiss-
Wright Opp'n"), ECF No. 348.  Curtiss-Wright replied on October
18, 2013.  Def. Curtiss-Wright Corp.'s Reply Mem. Points &
Auths. Supp. Mot. Summ. J. Causation ("Curtiss-Wright's Reply"),
ECF No. 366.

Fourth, on September 23, 2013, Eaton, individually and as
successor-in-interest to Culter Hammer, Inc. (collectively
"Eaton"), moved for summary judgment on all claims as to it.
Def. Eaton Corp., Individually & Successor-in-Interest Cutler

4

Hammer, Inc.'s Notice Mot. Summ. J. ("Eaton SJ Mot."), ECF No. 341; see id., Ex. 1, Def. Eaton Corp., Individually & Successor-in-Interest Cutler Hammer, Inc.'s Mot. Summ. J. Mem. Points & Auths. ("Eaton's Mem."), ECF No. 341-1.  The Plaintiffs filed an opposition memorandum on October 4, 2013.  Pls.' Mem. Points & Auths. Opp'n Def. Eaton Corp.'s Mot. Summ. J. ("Pls.' Eaton Opp'n"), ECF No. 349.  Eaton replied on October 18, 2013.  Def. Eaton Corp., Individually & Successor-in-Interest Cutler Hammer, Inc.'s Reply Brief Supp. Mot. Summ. J. ("Eaton's Reply"), ECF No. 364.

An oral hearing on these motions took place on September 5, 2014, and the Court took all issues under advisement.  Minutes, Sept. 5, 2014, ECF No. 425.  On September 10, the Court issued an order GRANTING the summary judgment motions brought by Schneider, ECF No. 333, and Eaton, ECF No. 341.  Order, Sept. 10, 2014, ECF No. 426.  The Court's order also requested further briefing from the Plaintiffs on the admissibility of the proffered expert testimony of Mark A. Thomson, whose opinions are central to the issues raised by UTC's and Curtiss-Wright's motions.  Id. at 4.  Responsive briefing was filed on September 19, 2014.  See Further Expert Briefing Re: Mark Thomson's Daubert Admissibility Defs. United Techs. Corp. & Curtiss-Wright Corp. ("Thomson Daubert Mem."), ECF No. 427.

**B.   Undisputed Facts[2]**

Gerald Livingston was a career aircraft electrician with a
history of service in the United States Air Force ("Air Force").
See Am. Compl. ¶ 29.  He worked as an aircraft electrician for
the Air Force at various bases from 1952 to 1961.  Id.  This
period is the primary focus of the Plaintiffs' claims of
exposure regarding UTC, Schneider, Curtiss-Wright, and Eaton.
See Pls.' UTC Opp'n 1:2-3; Pls.' Schneider Opp'n 2:5-16; Pls.'
Curtiss-Wright Opp'n 1:2-3; Pls.' Eaton Opp'n 2:5-16.  In 1961,
Livingston left active duty and served in the Air Force Reserve,
continuing to work in some capacity as an aircraft electrician.
See Am. Compl. ¶ 29.

Livingston was qualified to perform comprehensive
electrical work on several models of aircraft flown by the Air
Force, including the Douglas C-54 and the Boeing B-29, B-47, B-
49, and B-52.  Pls.' Statement Genuine Issues Opp'n United
Techs. Corp.'s Mot. Summ. J 3:13-20, ECF No. 347-1.  Across the
several bases where he worked during his ten years of service,
Livingston testified that approximately sixty percent of his
time was spent in an electrical shop working on individual

---

[2] As the court is dealing with four motions for summary
judgment (and therefore four separate sets of facts), not all
facts are relevant to all parties.  However, all facts presented
by the Plaintiffs are cited only once, not individually for each
party, unless required for clarity.

airplane components.  Livingston Dep.[3] 210:1-213:4.  The remaining forty percent of Livingston's work involved outdoor "flight line work," during which he would check or otherwise inspect an assembled aircraft alongside workers specialized in other trades and conducting simultaneous maintenance.  See id. 212:16-21, 310:7-311:22.

In the electrical shop, Livingston specifically recalls working on engine starters, generators, and wiring.  Id. at 458:20-459:23.  While these parts were usually removed from their aircraft by other maintenance workers and brought to the electrical shop as stand-alone parts, Livingston remembered occasions when he would uninstall the parts himself.  Id. at 518:10-520:8.

When parts were brought to the electrical shop by others or retrieved from inventory, it is unclear whether Livingston would have been able to identify from what aircraft model they came. Livingston testified that parts came into the shop with repair

---

[3] Livingston's deposition, which took place on August 8-10 and 21-22, 2012 is consecutively paginated and is attached as an exhibit to each of the Plaintiffs' memorandums opposing summary judgment, although the specific pages of the deposition vary from exhibit to exhibit.  See Pls.' UTC Opp'n, Ex. A, ECF No. 347-5; Pls.' Schneider Opp'n, Ex. A, ECF No. 350-4; Pls.' Curtiss-Wright Opp'n, Ex. A, ECF No. 348-5; Pls.' Eaton Opp'n, Ex. A, ECF No. 349-4.  The deposition is also attached to the Defendants' memorandums supporting summary judgment.  See UTC SJ Mot., Ex. B, ECF No. 330-2, 330-3; Schneider SJ Mot., Ex. F, ECF No. 333-3; Curtiss-Wright SJ Mot., Ex. 2, ECF No. 336-5; Eaton SJ Mot., Ex. F, ECF No. 341-9.  The deposition, in full, will be referred to as "Livingston Dep."

tags identifying "what aircraft that part came out of," and he specifically recalled seeing "[s]tarter tags." Id. at 238:8-24. On the other hand, Livingston later stated that he and his colleagues worked on parts without knowing which aircraft they were taken from or what the brand name, manufacturer, or supplier of the parts were. Id. at 459:24-460:14.

On the flight line, Livingston conducted pre- and post-flight visual inspections and other electrical repair tasks on fully assembled aircraft. The work required Livingston to, at various times, perform work on all parts of the aircraft, including the cockpit, tail, wings, and bomb bay. Id. at 24:7-28:3. Some of this work required him to be "around" the aircraft engines while they were being maintained by other specialists. Id. at 27:7-12.

Evidence suggests that at least some of Livingston's work was on airplanes that still had all of their original components. Livingston sometimes consulted aircraft repair logs in the course of his work, and he remembered times when he was part of the first crew ever to work on an aircraft, because the machine was so new. Id. at 47:15-62:15. Other evidence suggests that the fleet at the bases where Livingston worked were "relatively new." Decl. Mark A. Thomson Opp'n Defs.' Mots. Summ. J. ("Thomson Decl.") ¶ 15, ECF No. 348-3 ("During the 1950s, most of the aircraft Livingston worked on were relatively

new . . . .").

Livingston also worked on control panels, Livingston Dep.
113:21-115:13, and circuit breakers, id. at 116:2-4, 124:19-
127:23, in the course of his aircraft work.  The only tasks he
performed with regard to control panels was to install or remove
them from the aircraft using a screwdriver.  Id. at 113:4-
115:16, 386:16-389:4, 391:23-393:10.  This process would
occasionally take up to an hour to complete.  Id. at 390:23-
391:13 ("Most of them were just a five-, ten-minute job. Then
there were other ones that took an hour or better."); see also
id. at 425:12-15.

## II.  ANALYSIS

### A.  Legal Standard

#### 1.  Summary Judgment Standard of Review

Summary judgment is proper when, based on the materials in
the record, "there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a).  An issue of material fact is genuine "if
the evidence is such that a reasonable jury could return a
verdict for the nonmoving party."  Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 248 (1986).  Whether a fact is material or
not depends on the substantive law of the case, and only factual
disputes that might affect the outcome of the suit can properly
preclude summary judgment.  Id.  When deciding a motion for

summary judgment, the Court views the record "in the light most favorable to the non-moving part[y]" and draws all reasonable inferences in their favor.  Pineda v. Toomey, 533 F.3d 50, 53 (1st Cir. 2008).  Save as to facts admitted by both parties, the Court must disregard all evidence upon which the moving party bears the burden of proof.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000).

### 2.  Legal Standards for Asbestos Injury

The California Supreme Court has established a two-part test for determining whether a plaintiff has established that exposure to a defendant's asbestos-containing product was a legal cause of the plaintiff's injuries: "[T]he plaintiff must first establish some threshold exposure to the defendant's defective asbestos-containing products, and must further establish in reasonable medical probability that a particular exposure or series of exposures was a 'legal cause' of his injury, i.e., a substantial factor in bringing about the injury."  Rutherford v. Owens-Illinois, Inc., 16 Cal. 4th 953, 982 (1997) (footnote omitted).

All four motions currently before the Court deal with the issue of threshold exposure, so the Court will limit its discussion to that part of the rule.  The "threshold exposure" standard sets a relatively low bar and is satisfied by evidence that Livingston was exposed to, or worked with, the defendant's

product.  See, e.g.,  Hernandez v. Amcord, Inc., 215 Cal. App. 4th 659, 674 (2013) (finding threshold exposure based on testimony that plaintiff used the substance, "which created visible dust around his face and clothing," "'a lot of times,' or 'all the time'"); Staton v. Am. Standard, MDL No. 875, 2012 WL 3536323, at *1 n.1(II)(C)(i)(b) (E.D. Pa. July 24, 2012) (denying defendant's summary judgment due to evidence that plaintiff, "on at least twenty (20) to thirty (30) occasions, . . . was exposed to and breathed in respirable asbestos" from defendant's product).  "Mere speculation or conjecture about exposure to asbestos, however, is insufficient . . . ."  Casey v. Perini Corp., 206 Cal. App. 4th 1222, 1237 (2012); see also McGonnell v. Kaiser Gypsum Co., Inc., 98 Cal. App. 4th 1098, 1105 (2002) (granting summary judgment for the defendant when evidence suggested that defendant's "products might have been used once," but no evidence showed that products contained asbestos at the time).

When determining "threshold exposure," evidence must support that the exposure in question was to the defendant's product, not a replacement or third-party product.  See, e.g., Doucet v. Asbestos Corp., MDL No. 875, 2013 WL 5548678, at *1 n.1(III)(C) (E.D. Pa. May 30, 2013) (granting defendant's summary judgment motion because, while defendant provided original engines with asbestos parts, there is no evidence that

the plaintiff was exposed to an original part, as opposed to a replacement); O'Neil v. Crane Co., 53 Cal. 4th 335, 349-50 (2012) ("Although the internal gaskets and packing originally supplied with defendants' products contained asbestos, none of these original parts remained on board the [ship] by the time [plaintiff] arrived decades later.").

## B. Motions for Summary Judgment by UTC [ECF No. 330] and Curtiss-Wright [ECF No. 336]

According to the Plaintiffs, Livingston was exposed to asbestos in UTC and Curtiss-Wright products from working on three models of aircraft: the Boeing B-29, the Boeing B-52, and the Douglas C-54. In the period of Livingston's Air Force service, Boeing B-52 aircraft were originally fitted with engines manufactured by Pratt & Whitney, now UTC, Pls.' UTC Opp'n, Ex. C, Boeing Co.'s Further (2d) Supplemental Resps. Pls.' Interrogs. 20, ECF No. 347-7; see also Pls.' UTC Opp'n, Ex. B, Def. United Techs. Corp.'s Resps. Pls.' Req. Admis. (Set One) ("UTC Admis.") No. 12, ECF No. 347-6, and Boeing B-29 and Douglas C-54 aircraft were fitted with Curtiss-Wright aircraft engines, Pls.' Curtiss-Wright Opp'n, Ex. B, Boeing Co.'s Further (2d) Supplemental Resps. Pls.' Interrogs. 19, 21, ECF No. 348-6. Pratty & Whitney also supplied engines for use on C-54s. UTC Admis. No. 13. Both UTC and Curtiss-Wright have moved for summary judgment on all claims against them, on the basis that

the Plaintiffs have failed sufficiently to allege Livingston's
exposure to asbestos from the Defendants' products.

## 1.  **Thomson's Expert Testimony**

As a preliminary matter, the admissibility of the
Plaintiffs' expert testimony by Mark Thomson ("Thomson") is in
dispute, and it is evident that Thomson's testimony is the
linchpin of the Plaintiffs' claims of exposure against UTC and
Curtiss-Wright. Thomson is an experienced pilot and civilian
aviation mechanic and has been the custodian of "one of the
largest privately-owned aviation libraries in the United States"
for nearly four decades.  Thomson Decl. 2:6-18.  On this basis,
Thomson claims he has "developed a working knowledge of the use
of asbestos parts in military aircraft, and how to confirm
whether suspected asbestos parts did, in fact, contain
asbestos."  Id. at 3:3-5.

Thomson's opinions are essential to establishing the
Plaintiffs' claim of asbestos exposure.  Thomson offers several
possible ways Livingston would have been exposed to asbestos in
the course of his work: removing and installing the asbestos
gaskets that mount engine starters onto engines; removing and
replacing gaskets and heat shields from engines; disturbing
thermocouples attached to asbestos gaskets; and working with and
around clamps containing asbestos.  Id. 5:1-6:7.  Thomson also
asserts that Livingston was "routinely exposed to asbestos dust"

during his flight line work.  Id. at 4:8-10.  As Thomson explains, asbestos dust created by the vibration and abrasion of asbestos components during plane operation would have been regularly disturbed and dispersed into the air by the work of trade specialists working shoulder-to-shoulder with Livingston on the flight line.  Id. at 4:1-21.  Livingston would have breathed this dust even when not working on the B-52's engine components.  Id. at 4:6-8.

Upon review of the Plaintiffs' supplemental briefing, Thomson Daubert Mem., however, the Court rules that his testimony is not admissible.  Thomson is simply not a qualified expert under Fed. R. Evid. 702.  "Rule 702 grants the district judge the discretionary authority, reviewable for its abuse, to determine reliability in light of the particular facts and circumstances of the particular case."  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 158 (1999).  In considering the factors set forth in Daubert, Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), Thomson's testimony, while relevant, falls short of the reliability standards required under Rule 702.

## 2. Livingston's Threshold Exposure to Asbestos from Pratt & Whitney and Curtiss-Wright Engines

The Plaintiffs rely on the same generalized allegations regarding the nature of Livingston's work to support their

14

claims of exposure to asbestos from Pratt & Whitney and Curtiss-Wright products. But without Thomson's testimony, the record lacks any evidence that Livingston's flight line work exposed him to asbestos dust in the manner the Plaintiffs claim. To sustain their allegations of exposure, the Plaintiffs would need to proffer evidence that Livingston worked directly with the Defendants' products containing asbestos, and there is little evidence that he did.

As an electrician for the Air Force, Livingston interacted with aircraft and their parts differently than did other trade workers, like mechanics, whose jobs required them directly to act on asbestos components. He appears to have worked on components that cannot be said to have contained asbestos or that cannot be connected either to Pratt & Whitney or Curtiss-Wright products. For example, while Livingston did recall cutting gasket material with a "rough surface" and "kind of a blotchy look" that would shed debris, Livingston Dep. 67:4—69:9, his memory was not specific to any aircraft model, id. at 66:6-21. Supplementary evidence, such as testimony that Pratt & Whitney provided pre-cut gaskets for its engines, only confirms that it is not reasonable to infer that Livingston worked directly with cutting gasket material for the B-52 engine.

Given this lack of evidence, the Court need not reach the other issues disputed in the parties' briefs, such as whether

15

Livingston actually worked on parts from originally-fitted Pratt
& Whitney or Curtiss-Wright engines (as opposed to replacement
parts), or whether those engines contained asbestos at all.  The
Court GRANTS summary judgment to UTC and to Curtiss-Wright.

## C.   Motions for Summary Judgment by Schneider [ECF No. 333] and Eaton [ECF No. 341]

The Plaintiffs' claims against Schneider and Eaton stem
from allegations that Livingston was exposed to asbestos in the
course of working with control panels and circuit breakers
manufactured by the two Defendants' predecessors-in-interest:
Square D Company ("Square D"), known today as Schneider, and
Cutler-Hammer, Inc. ("Cutler-Hammer"), now represented by Eaton.
According to the Plaintiffs, these control panels and circuit
breakers were made from phenolic materials incorporating
asbestos.  Pls.' Schneider Opp'n 8:18-9:7; Pls.' Eaton Opp'n
7:14-25.  Both Schneider and Eaton seek summary judgment on all
claims against them based on insufficient evidence of exposure.

### 1.   Thomson's Expert Testimony

In opposing Schneider's motion to exclude, the Plaintiffs
again rely on the testimony of Mark Thomson.  See Pls.'
Schneider Opp'n 5:23-7:24.  The same Daubert gatekeeping
considerations discussed above apply to the use of Thomson's
testimony here, but analyzing Thomson's qualifications and
methodology is of little use in deciding Schneider and Eaton's

motions.  His statement provides virtually no useful insight into Square D or Cutler-Hammer products.  Thomson does not mention Square D, Cutler-Hammer, control panels, or circuit breakers of any kind, nor the work Livingston would perform on such parts.  The closest reference to the Defendants' products is Thomson's inclusion of "phenolics" in a laundry list of components containing asbestos in B-29, B-47, and B-52 aircraft. Thomson Decl. ¶ 6.  Phenolics are hard, dense materials designed to withstand high temperatures, and the Plaintiffs suggest that Square D and Eaton's control panels and circuit breakers were made of phenolic material containing asbestos.  See Pls.' Schneider Opp'n 12:26-13:7; Pls.' Eaton Opp'n 2:28-3:27. Without more, Thomson's single mention of phenolics as an airplane component that can vibrate and abrade during aircraft operation is not enough to implicate Square D or Cutler-Hammer products, nor does it provide useful insight into how phenolic components, specifically, might produce asbestos dust.  His opinions thus lend no support to the Plaintiffs' opposition to either motion.

### 2. Threshold Exposure to Asbestos in Square D Products

The Plaintiffs' best arguments as to exposure point to purported admissions by Schneider and Eaton that their products contained significant amounts of asbestos.  Pls.' Schneider

Opp'n, Ex. B, Def. Square D Co.'s Objections & Resps. Pl.'s
Interrogs. & Req. Prod. Docs., Set I, Resp. 4, ECF No. 350-5;
Pls.' Schneider Opp'n, Ex. C, Def. Schneider Elec. USA, Inc.'s
(Formerly Known As Square D Co.) Resps. Pls.' Reqs. Admis. 5:26-
6:22, 8:22-9:17, ECF No. 350-6; Pls.' Schneider Opp'n, Ex. D,
Disc. Dep. Robert Barbaglia 53:21-54:13, 56:6-21, 60:11-61:19,
64:6-66:19, 102:7-103:8, ECF No. 350-7; Pls.' Schneider Opp'n,
Ex. E, Videotape Dep. Carlo Martino Apr. 18, 2008 156:6-17, ECF
No. 350-8; Pls.' Schneider Opp'n, Ex. F, Dep. Carlo F. Martino
Oct. 1, 2008 100:25-101:22, 120:20-124:4, ECF No. 350-9; Pls.'
Schneider Opp'n, Ex. G, Def. Schneider Elec. USA, Inc.'s
(Formerly Known As Square D Co.) Resps. Pls.' Special Interrogs.
5:19-26, ECF No. 350-10; Pls.' Eaton Opp'n, Ex. B, Cutler-Hammer
Inc.'s Am. Resps. GO 129 Standard Abestos Interrogs. 5:22-25,
ECF No. 349-5; Pls.' Eaton Opp'n, Ex. C, Video Examination Fred
R. Boness 25:22-27:21, 84:25-85:16, 112:17-113:17, ECF No. 349-
6.  This is not enough, however, to satisfy the Plaintiffs'
evidentiary burden.

According to Schneider, the most that can be gleaned from
its admissions is that "Square D made some asbestos-containing
products at some point in its history."  Schneider's Reply 6:1-
21.  An examination of the Plaintiffs' statement of material
facts shows that they rely solely on Schneider's statements that
"some" of its composite materials manufactured in the 1950s

18

through the 1980s contained asbestos fibers, and that its high-end phenolic materials sold for commercial use "probably" contained asbestos material.  See Pls.' Statement Genuine Issues Opp'n Def. Schneider Elec. USA, Inc.'s Mot. Summ. J. 58-64, ECF No. 350-1.

This is not enough to support a reasonable inference that the Square D materials with which Livingston worked contained asbestos.  Further information is required to connect Livingston to the Square D materials that actually contained asbestos, like evidence of what percentage of Square D products contained asbestos during Livingston's working years, or other indications of how likely it is that Livingston would have worked with these specific products.  See McGonnell, 98 Cal. App. 4th at 1105-06 (declining to draw an inference of exposure when evidence only suggested the plaintiff "might have cut into a wall that might have contained [defendant's product] that might have contained asbestos" (emphasis added)).  Beyond Livingston's recollection that the products with which he worked had "Square D" written on them, the Plaintiffs have not been able to provide any model numbers or other specific information that would allow Schneider to pinpoint which products in its line were available to Livingston.

The Plaintiffs' best evidence going to probability is the admission that Square D's commercial phenolic materials

"probably" or "most probably" contained asbestos -- but Livingston's testimony about Square D materials does not demonstrate that any of the Square D equipment with which he worked was made of phenolic material. Livingston indicated that he understood phenolics to be designed for high temperature use, but he did not recall ever encountering phenolic materials as part of the electrical systems he worked on. Livingston Dep. 111:1-112:21. When asked to recall what material the control panels with which he worked were made of, he stated that they were "mainly made out of a hard material, like steel." Id. at 113:4-10. When specifically asked what materials other than steel Square D control panels were made of, Livingston could not recall. Id. at 115:17-22. This is insufficient to support the Plaintiffs' attempt to elide information about phenolics generally with Livingston's exposure to Square D products, when there is little evidence that Livingston worked with Square D products made of phenolic materials.

Because the Plaintiffs fail sufficiently to establish that any specific Square D products would have exposed Livingston to asbestos, the Court need not reach Schneider's additional argument that the record lacks admissible evidence that Livingston ever worked with phenolics manufactured by Square D, as opposed to another manufacturer. Schneider's Mem. 7-9. The Court GRANTS summary judgment to Schneider.

### 3.    Threshold Exposure to Asbestos in Cutler-Hammer
Products

For similar reasons, the Plaintiffs' claims against Eaton
likewise do not survive summary judgment.  The evidence
establishes that "Cutler-Hammer manufactured and sold asbestos-
containing electrical equipment from the 1940s through the late
1970s," Pls.' Eaton Opp'n 7:12-13, but much more is required at
this stage.  No testimony from Livingston warrants an inference
that the Cutler-Hammer products with which he actually worked
contained asbestos ingredients, and there is not even evidence
establishing any quantum of likelihood that the products would
have posed such a danger.  Because the Plaintiffs fail to
establish threshold exposure in Cutler-Hammer products, the
Court GRANTS summary judgment to Eaton.

### 4.    Punitive Damages

The Plaintiffs additionally assert a punitive damages claim
against Square D.  If the Court rules that Square D ought be
granted summary judgment on the issue of actual damages, it may
summarily conclude that Square D also ought be granted summary
judgment as to punitive damages.  "Punitive damages are not
simply recoverable in the abstract.  They must be tied to
oppression, fraud or malice in the conduct which gave rise to
liability in the case."  Medo v. Superior Court, 205 Cal. App.
3d 64, 68 (1988) (emphasis in original) (adding that "punitive

21

damages must bear a reasonable relation to the actual damages"). In the absence of evidence that a reasonable juror would find Square D liable for actual damages, Square D cannot be held liable for punitive damages.

## III. CONCLUSION

For the foregoing reasons, the Court GRANTS the motions for summary judgment brought by United Technologies Corporation, ECF No. 330, Curtiss-Wright Corporation, ECF No. 336, Schneider Electric USA, Inc., ECF No. 333, and Eaton Corporation, ECF No. 341.

**SO ORDERED.**

WILLIAM G. YOUNG
DISTRICT JUDGE